0835

HERALD PUBLISHING COMPANY, INC., and Carolina Newspapers, Inc., d/b/a Yorkville Enquirer, Appellants-Respondents v. Eugene L. BARNWELL, in his capacity as Mayor, Tommy Benfield, Gerald Kemp, Jr., William Miller, Craig Reed, Heyward Reid, and Roddey Connolly in their capacity as Members of the City Council, Respondents-Appellants.

(351 S. E. (2d) 878)

Court of Appeals

*James M. Brailsford, III,* and *Patricia·B. Kinard,* of *Robinson, McFadden, Moore, Pope, Williams, Taylor & Brailsford,* Columbia, and *J. Buford Grier,* Rock Hill, *for appellants-respondents.*

*William M. Brice, Jr.,* York, and *E. N. Zeigler,* of *Zeigler, McEachin & Graham,* Florence, *for respondents-appellants.*

*Jay Bender,* of *Belser, Baker, Barwick, Ravenel, Toal & Bender,* Columbia, *for amici curiae South Carolina Press Ass'n* and *Associated Press.*

Heard Oct. 22, 1986.

Decided Dec. 15, 1986.

SANDERS, Chief Judge:

Herald Publishing Company, Inc., the owner of the *The Evening Herald* newspaper, and Carolina Newspapers, Inc., d/b/a the *Yorkville Enquirer* newspaper, brought this action against the members of the York City Council alleging that the Council had violated the South Carolina Freedom of Information Act by discussing subjects not permitted by the Act in an executive session and by holding the executive session without following the procedure mandated by the Act. The newspapers sought an order restraining the Council from further violations. The Council denied the alleged violations and counterclaimed, alleging that the newspapers had violated the Act by eavesdropping on the executive session. The Council sought an order declaring the actions of the newspapers to be a nuisance and restraining the newspapers from further eavesdropping on its executive sessions. After hearing the case without a jury, the trial judge denied the relief sought by both the newspapers and the Council. They both appeal. We affirm.

On November 16, 1984, the mayor of York, Eugene L. Barnwell, sent a memorandum to the other members of city council, the city manager and members of the news media announcing that the Council would meet in executive session on November 26, 1984 for four stated purposes.

Following receipt of this memorandum, the executive editor of the *Herald* prepared a statement to the Council to the effect that the discussion in executive session of three of the items would violate the Act. Peter Judge, a reporter for the *Herald,* appeared at the November 26 meeting and presented this statement to the Council. Also present from the news media was Gene Graham, a reporter for the *Enquirer.*

In response to the statement presented by Mr. Judge and on the advice of the city attorney, Mayor Barnwell announced that the three challenged items would not be discussed. The Council then voted to go into executive session. Mayor Barnwell announced that while in executive session the Council would discuss the employment of a person for the development of a training session for the Council, hear a legal presentation by attorneys for the city and receive a report from consultants on the proposed water treatment plant.

To fully understand what occurred at the November 26 meeting, some background information is helpful. The city of York had experienced ongoing problems with its waste water treatment plant which resulted in both actual and anticipated litigation. A lawsuit by the city against the contractor and engineer for the plant went to trial in November, 1983 and was settled after nearly two weeks of testimony. By the terms of the settlement, the city did not release the contractor and engineer from liability for latent defects. A leak in the wall of the filter chamber was discovered in the fall of 1984, several months prior to the November 26 council meeting. The Environmental Protection Agency had decertified the structure earlier that year.

York was being represented in its continuing problems with the waste water treatment plant by attorneys from the office of the South Carolina Attorney General. Victor Evans, one of the attorneys from that office representing the city, had met with EPA officials in Atlanta on November 21, the Wednesday before the November 26 meeting. Following his meeting with the EPA officials in Atlanta, Mr. Evans requested that he be allowed to make a presentation to the Council.

At the executive session, Mr. Evans and another attorney from the office of the Attorney General briefed council members concerning certain contractual problems with EPA in connection with the waste water treatment plant, the need for funding for the anticipated litigation and the hiring of a consulting engineering firm to determine exactly what was wrong with the wall at the waste water treatment plant and how it could be fixed.

At the same time that the Council was struggling with problems at the waste water treatment plant, it was also studying various options for the development of an alternative water supply for the city.

The three alternatives being considered were the purchase of water directly from the city of Rock Hill, the purchase of water from the city of Rock Hill, with the York County Council acting as intermediary and the construction of its own water treatment plant on Lake Wylie.

In October, 1984, the York County Council had given the city of York sixty days to decide whether the city would be

part of a countywide water system.

The Council had previously hired a consulting engineering firm to study the alternatives. Two representatives of that firm presented a preliminary report to the Council at the November 26 meeting.

Mayor Barnwell testified that he did not know that the consultants would be at the November 26 meeting until either the Wednesday or Friday before the meeting and he did not know that the attorneys wanted to brief the Council until the day of the meeting. The Thursday before the meeting was Thanksgiving. No amended agenda was ever sent out.

During the executive session, Mr. Judge, the *Herald* reporter, waited outside the meeting room. While the attorneys were making their presentation, the two consultants waited outside with him. After the consultants went into the meeting, Mr. Judge realized that he could hear everything that was going on through a gap between the doors and he began to take notes. He was joined shortly thereafter by Jeff Cowart, the city editor of the *Herald,* who also took notes.

Following the executive session, the Council went back into open session and voted unanimously to hire the firm of Wilbur Smith and Associates to study the problems with the wall at the waste water treatment plant.

The formal report of the consulting firm hired in connection with the water system was received by the Council in open session at its regularly scheduled meeting on December 5, 1984. At that time the Council voted to proceed with the construction of its own water treatment plant.

An article by Mr. Judge and Mr. Cowart about the Council meeting appeared in the following edition of the *Herald.* It recounts the presentation by the Charlotte consultants, at times directly quoting Mayor Barnwell from statements he made in the executive session. The article also discussed the earlier presentation by the attorneys, although in a more indirect fashion.

## I. THE NEWSPAPERS' APPEAL

The trial judge found that there was no violation of the Act proven by the newspapers and that discussions by the Council of the water treatment plant fell under the exemp-

tion in the Act for discussions "incident to proposed contractual arrangements." He further found that the evidence showed that the Council had displayed a continuing good faith effort to comply with both the letter and the spirit of the Act.

The South Carolina Freedom of Information Act is codified as Section 30-4-10 to -110, Code of Laws of South Carolina, 1976, as amended. Our research reveals that the legislature of every state as well as the Congress of the United States has enacted open meeting laws, or freedom of information acts, in some form or another. Because no two acts are the same, however, and because each case differs factually from others, cases from other states construing their statutes are of little assistance to us in our analysis. *Marsh v. Richmond Newspapers, Inc.*, 223 Va. 245, 288 S. E. (2d) 415 (1982).[1]

A

The newspapers first argue that the topics discussed by the Council in executive session did not fall under any of the specific exemptions recognized by the Act. We reject this argument.

The guiding principle of South Carolina's Freedom of Information Act, enacted in 1978, is that "every meeting of all public bodies shall be open to the public." Section 30-4-60. However, under the Act closed sessions are allowed for a number of purposes. Section 30-4-70(a)(2) permits a public body to meet in executive session for "discussion of negotiations incident to proposed contractual arrangements and proposed sale or purchase of property [and] the receipt of legal advice."

The presentation by the attorneys concerning the ■■ waste water treatment plant clearly falls within the exemption for the receipt of legal advice provided by Section 30-4-70(a)(2). While the city was not involved in

---

[1] None other than recently appointed United States Supreme Court Justice Scalia has termed the Federal Freedom of Information Act "the Taj Mahal of the Doctrine of Unanticipated Consequences, the Sistine Chapel of Cost-Benefit Analysis Ignored." Scalia, *The Freedom of Information Act Has No Clothes*, REG., Mar.-Apr. 1982, at 14, 15. Needless to say, we would never apply either pejorative to a statute enacted by our General Assembly.

litigation at the time, litigation was a very real possibility. The exemption does not require that a public body actually be engaged in litigation, only that legal advice be rendered.

The presentation by the consultants concerning the development of an alternative water supply for the city of York likewise falls within the exemption provided by Section 30-4-70(a)(2).

The three alternatives which were being considered by the city and were being evaluated by the consulting firm all involved negotiations incident to proposed contractual arrangements. A decision by the Council to purchase water from the city of Rock Hill, whether directly or through the county as an intermediary, would necessarily require contractual arrangements with the city of Rock Hill. Similarly, a decision by the city to proceed with the construction of its own water plant would obviously involve both contractual arrangements and the purchase of property by the city.

The newspapers argue that the exemption for discussion of negotiations incident to proposed contractual arrangements and proposed sale or purchase of property applies only to contractual arrangements or property purchases at hand. We do not read the Act so narrowly.

The consulting firm had investigated the necessary steps to carry out each of the three alternatives and presented those to the Council. York County Council had given the Council sixty days to decide whether to become part of a countywide water system. Discussion of the various considerations attendant to deciding whether to accept the offer of the county, and thus enter into a binding contract, or whether to pursue one of the other alternatives amounted to a discussion of negotiations incident to proposed contractual arrangements or proposed purchase of property.

The newspapers appear to argue further in their brief that the Council violated the Act by discussing the employment of a person to develop a training session. We do not address this argument because no such violation was alleged by the newspapers as a basis of their complaint.

### B

The newspapers next argue that the Council did not follow the procedural requirements of the Act in

going into executive session. We are also unpersuaded by this argument.

Section 30-4-70(a)(5) requires that "[p]rior to going into executive session the public agency shall vote in public on the question and when such vote is favorable the presiding officer shall announce the purpose of the executive session." The newspapers argue that the Council violated the requirements of the Act because Mayor Barnwell did not announce the purpose of the executive session.

The Act does not provide any definition of the word "purpose." In our opinion, Mayor Barnwell sufficiently announced the purpose of the executive session when he disclosed specifically what was going to be discussed.

## C

The newspapers further argue that the Council violated the procedural requirements of the Act by changing the published agenda for the November 26 meeting.

The Act requires that public bodies post a public notice of any special meeting including the agenda, date, time and place of the meeting. Section 30-4-80(a). Additionally, under the Act, public bodies are required to make an effort to notify local news media, or such other news media as may request notification, of the agenda, dates, times and places of all public meetings. Section 30-4-80(d).

The newspapers do not contend that the required notice was not posted or that they did not receive it. Rather, they argue that the order of the Circuit Court should be reversed because the Council took up matters not on the agenda while in executive session. We reject this argument for two reasons.

### 1

The Act does not require that an agenda for an executive session be posted or that the news media be notified of the agenda of an executive session. Instead, the Act requires that the presiding officer of a public body which has voted to go into executive session shall announce the purpose of the executive session. Section 30-4-70(a)(5). Practically speaking, it is easily foreseeable that public bodies might not know what will be taken up in executive session until they are meeting in an open session.

The Act recognizes this by providing that an executive session can only follow an open session, where the public body must vote in· public to meet in executive session. *Id.*

2

We are unable to discern any prejudice to the newspapers as a result of their not having an agenda of the November 26 meeting in advance of the meeting taking place. *Cf. Multimedia, Inc. v. Greenville Airport Commission,* 287 S. C. 518, 522, 339 S. E. (2d) 884, 887 (Ct. App. 1986) ("[S]ubstantial compliance with the Act will satisfy its requirements where a technical violation has no demonstrated effect on a complaining party.").

### D

The newspapers finally argue that "the public's right to know the public business is stifled and thwarted when the Freedom of Information Act is violated, disregarded and misapplied by public bodies and those violations are excused by the Court." Since we have decided that the Council did not violate the Act, it is unnecessary for us to address this argument.

### II. THE COUNCIL'S APPEAL

The trial judge denied the injunctive relief sought by the Council against the newspapers, ruling ·that "[t]he proof on the counterclaim is insufficient and it is dismissed." The Council argues that the trial judge erred in not granting this relief. We reject this argument based on our review of the record.

There is no evidence that the reporters did anything to enable them to overhear what was going on in the executive session other than to wait in the place provided as a waiting room for reporters and other members of the public. The Act contains no language prohibiting either this conduct or the publication of proceedings conducted in an executive session.

In support of its argument, the Council cites Section 16-17-470 which makes it "unlawful for any person to be an eavesdropper or a Peeping Tom on or about the premises of another." This statute is obviously inapplicable since the reporters were on public property and not "on or

about the premises of another."

For these reasons, the order of the trial judge is

Affirmed.

SHAW, J., and LITTLEJOHN, Acting Judge, concur.