609 S.E.2d 515

**The STATE, Petitioner/Respondent,**

v.

**Gerrod LEWIS, Respondent/Petitioner.**

No. 25943.

Supreme Court of South Carolina.

Heard Nov. 16, 2004.
Decided Feb. 22, 2005.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Charles H. Richardson, and Assistant Attorney General Deborah R.J. Shupe, all of Columbia; and Robert D. Robbins, of Summerville, for petitioner/respondent.

Assistant Appellate Defender Eleanor Duffy Cleary, of Columbia, for respondent/petitioner.

Justice MOORE:

Respondent/petitioner (Lewis) and his co-defendant, Timothy Washington, were convicted of first-degree criminal sexual conduct (CSC), two counts of kidnapping, grand larceny of a vehicle, and armed robbery. Lewis was sentenced to concurrent terms of thirty years for CSC, thirty years for each kidnapping charge, five years for grand larceny, and thirty

years for armed robbery.[1]  The Court of Appeals affirmed in part, reversed in part, and remanded.  *State v. Lewis*, 354 S.C. 222, 580 S.E.2d 149 (Ct.App.2003).  Judge Anderson dissented.  We now affirm in part and reverse in part.

## ISSUES

I.  Did the Court of Appeals err by affirming the trial court's failure to suppress an in-court identification?

II.  Did the Court of Appeals err by holding the trial court improperly disallowed Lewis's attempt to strike a juror who had previously been struck in violation of *Batson*?[2]

## DISCUSSION

### I

Lewis argues the Court of Appeals erred by affirming the trial court's decision not to suppress an in-court identification or to require an *in camera* hearing prior to the in-court identification.

Gill Armstrong and Jane Doe[3] were driving from Virginia to their home in Florida with their seven-month-old daughter when they stopped at a motel off I–95 in St. George about 11:00 p.m. Armstrong then left to get food.  Upon his return, he noticed three black males in the breezeway of the motel and assumed they were guests of the motel.  He had a direct view of the men because of the fluorescent lighting in the breezeway.  After taking the food into the hotel room, Armstrong then went to the vending machines to get drinks.  As he began to place money in the machine, the three men walked up to him and placed a gun to the back of his head.

---

1.  Washington received a sentence of life imprisonment without parole for the two kidnapping charges, the first-degree CSC charge, and the armed robbery charge.  He also received five years' imprisonment for each of the following charges: unlawful possession of a pistol, possession of a weapon during a certain crime, and grand larceny.  All of the sentences were to be served consecutively.

2.  *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

3.  To protect the female victim's identity, she will be referred to as Jane Doe.

The men then forced him into the motel room. Before entering the room, the men turned him around and Armstrong saw Washington holding the gun to his head. When they entered the room, the lights were on. Doe was just getting out of the shower and was clad only in a towel. Lewis asked where the money and jewelry was. While Lewis was digging in a duffel bag, Washington instructed Lewis to turn off the lights. Before the lights were turned off, Armstrong was able to view his assailants for a few minutes.

After the men did not find anything, Washington pointed the gun at Armstrong's daughter who was still asleep and said, "If you try anything, she's gone." The men became extremely angry when they discovered the couple had only $14. At this point, Armstrong was taken into the bathroom and was placed on his knees, bending over into the bathtub, with the gun pointed at him. At first, Lewis held Armstrong in the bathroom at gunpoint, but then the third man, Shermaine Elmore,[4] switched with Lewis.

Doe testified that two of the men, allegedly Lewis and Washington, then took turns forcing her to perform oral sex on them. Washington then took Doe into the bathroom, bent her over the toilet, and raped her while forcing Armstrong to watch. Then, the men asked for Armstrong's car keys. As they left, Washington told Armstrong "Happy Father's Day."[5] The men then took the couple's car and burned it.

Doe was not able to give a description of the attackers.[6] However, Armstrong told the police that the men were black males and gave general descriptions of their height, facial hair, and clothing.[7] A few days later, Shermaine Elmore informed

---

4. Elmore pled guilty to armed robbery and grand larceny on the first day of trial. Armstrong testified that Elmore was not involved in the assault on Doe.

5. The crimes occurred on Father's Day in 1999.

6. Further, Doe could not identify who had attacked her after viewing a photo line-up that contained all three of the alleged assailants.

7. The descriptions were as follows: (1) black male wearing a black hat and black coat, mustache, goatee, approximately 6 feet, 2 inches tall, and weighing approximately 175 pounds; identified as Washington at trial; (2) tall black male with slim build wearing baggy jeans and a t-

the police he was the lookout during the crimes. Elmore told the police that Washington and Lewis were the two men who sexually assaulted Doe. Armstrong confirmed at trial that Elmore had no involvement in the sexual assault.

At trial, Armstrong identified Washington and Lewis as the perpetrators. In fact, Armstrong stated he was "100 percent positive" in his identification of Lewis. Further, Armstrong testified the individuals that committed the crimes were "stuck in [his] mind." Counsel objected to the in-court identification and requested an *in camera* hearing to determine the reliability of his identification. The trial judge denied the request, and ruled that Armstrong could identify the defendants in court, even though Armstrong had never previously identified them.[8]

The Court of Appeals held that, since Armstrong had never previously identified the defendants, no hearing was necessary.[9] The court further held that the reliability of Armstrong's identification was a question for the jury and that Lewis' counsel extensively cross-examined Armstrong regarding the identification. In his dissent, Judge Anderson concurred in the result but found that the trial judge should have

shirt with green lettering, approximately 6 feet, 4 inches tall, and weighing approximately 175 pounds; identified as Elmore at trial; and (3) black male of medium height, medium build, no clothing description, approximately 6 feet tall, and weighing approximately 175 pounds; identified as Lewis at trial.

8. Armstrong was unable to return to South Carolina from Florida before the trial due to medical reasons.

9. The Court of Appeals found that the protection afforded a defendant when there has been an out-of-court identification does not apply to the situation where there has been only an in-court identification. If there had been a pre-trial identification, a hearing is mandated on the admissibility of that identification. *See* Rule 104(c), SCRE (hearings on admissibility of pretrial identifications of an accused shall in all cases be conducted out of the jury's hearing); *State v. Cheatham*, 349 S.C. 101, 561 S.E.2d 618 (2002) (*in camera* hearing required by Rule 104(c) allows defendant to question witness more stringently regarding possible misidentification or bias outside jury's presence; *per se* rule requiring court to hold *in camera* hearing when State offers identification testimony and defendant challenges in-court identification as being tainted by previous illegal identification.).

held an *in camera* hearing to determine the reliability of Armstrong's identification.

■ The Court of Appeals' decision represents the majority view that the *Neil v. Biggers*[10] analysis should not be extended to protect criminal defendants against identifications that occur for the first time in court without a pre-trial identification. In *Neil v. Biggers*, the United States Supreme Court found that a court must review the totality of the circumstances to determine whether an identification is reliable. *See also State v. Scipio*, 283 S.C. 124, 322 S.E.2d 15 (1984). The factors to be considered in evaluating the likelihood of misidentification include: (1) the opportunity of the witness to view the accused; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. at 199, 93 S.Ct. 375; *State v. Drayton*, 293 S.C. 417, 361 S.E.2d 329 (1987), *cert. denied*, 484 U.S. 1079, 108 S.Ct. 1060, 98 L.Ed.2d 1021 (1988).

■ We conclude, as the majority of courts have, that *Neil v. Biggers* does not apply to in-court identifications and that the remedy for any alleged suggestiveness of an in-court identification is cross-examination and argument. The United States Supreme Court has not extended its exclusionary rule to in-court identification procedures that are suggestive because of the trial setting. *See State v. Smith*, 200 Conn. 465, 512 A.2d 189, 193 (1986).

The Georgia supreme court has stated, "[b]ecause pretrial identification procedures occur beyond the immediate supervision of the court, the likelihood of misidentification in such cases increases, and courts have required that pretrial identification procedures comport with certain minimum constitutional requirements in order to ensure fairness." *Ralston v. State*, 251 Ga. 682, 309 S.E.2d 135, 136 (1983). *See also United States v. Domina*, 784 F.2d 1361 (9th Cir.1986), *cert. denied*, 479 U.S. 1038, 107 S.Ct. 893, 93 L.Ed.2d 845 (1987) (concern with in-court identification, where there has been suggestive pretrial identification, is that witness later identi-

---

10. *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

fies the person in court, not from his recollection of observations at time of crime, but from suggestive pretrial identification). However, as the *Ralston* court explained, these extra safeguards are not applicable to an in-court identification because the witness' testimony is subject to the same rules of evidence, witness credibility, and cross-examination as all testimony in a criminal trial. *Ralston v. State,* 309 S.E.2d at 136–137. *See also United States v. Bush,* 749 F.2d 1227 (7th Cir.1984), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1771, 84 L.Ed.2d 831 (1985) (deference shown jury in weighing reliability of potentially suggestive out-of-court identification would seem even more appropriate for in-court identifications where jury is present and able to see first-hand the circumstances which may influence a witness); *People v. Brazeau,* 304 A.D.2d 254, 759 N.Y.S.2d 268 (2003) (where there has not been a pretrial identification and defendant is identified in court for first time, defendant is not deprived of fair trial because defendant is able to explore weaknesses and suggestiveness of identification in front of the jury); *State v. Smith,* 200 Conn. 465, 512 A.2d 189 (1986) (defendant's protection against obvious suggestiveness in courtroom identification confrontation is his right to cross-examination); *People v. Rodriguez,* 134 Ill.App.3d 582, 89 Ill.Dec. 404, 480 N.E.2d 1147, 1151 (1985) *cert. denied,* 475 U.S. 1089, 106 S.Ct. 1476, 89 L.Ed.2d 731 (1986) (where witness first identifies defendant at trial, defense counsel may test perceptions, memory, and bias of witness, contemporaneously exposing weaknesses and adding perspective to lessen hazards of undue weight or mistake).

Accordingly, we conclude *Neil v. Biggers* does not apply to a first-time in-court identification because the judge is present and can adequately address relevant problems; the jury is physically present to witness the identification, rather than merely hearing testimony about it; and cross-examination offers defendants an adequate safeguard or remedy against suggestive examinations. Therefore, the Court of Appeals properly concluded the trial court did not err by denying Lewis' request for an *in camera* hearing prior to the in-court identification by Armstrong.[11] In any event, Armstrong's in-

11. Regarding Lewis' argument that the trial court should have conducted a photographic lineup prior to Armstrong being allowed to give an in-court identification, we find there is no constitutional entitlement to

court identification was strong, detailed, and clear, and would have survived an *in camera* hearing.

## II

■ The State argues the Court of Appeals erred by holding the trial judge improperly disallowed Lewis' attempt to strike a juror who had previously been struck for discriminatory reasons in violation of *Batson.*[12]

During jury selection, Lewis exercised peremptory strikes on nine white jurors. His co-defendant, Washington, also separately struck nine white jurors, including juror 304, a white female. At the end of jury selection, the State requested a *Batson* hearing. Each defendant separately presented reasons for his respective strikes. Lewis stated he did not want housewives to be jurors and that is why he struck two white females. Washington explained he struck juror 304 because she was a housewife. In argument, the State pointed out that neither Washington nor Lewis had struck Juror 166, who was also a housewife. The trial court found several jurors, including juror 304, had been struck for reasons not race-neutral or gender-neutral. The parties then began selecting a second jury.

Juror 304 was presented again. Washington accepted the juror, but Lewis attempted to strike her. At that point, the trial court asked the attorneys to approach the bench and told Lewis' attorney he could not strike the juror because the court had already held that the reason for the previous strike was pretextual. Lewis therefore accepted the juror. After finishing the second jury selection process, Lewis moved to quash the jury and re-select another jury because he was not allowed to exercise a peremptory strike. Lewis' counsel argued he should be allowed to strike juror 304 because he had an independent reason to strike her, *i.e.* due to her demeanor.

---

an in-court line-up or other particular method of lessening the suggestiveness of an in-court identification. *See United States v. Domina,* 784 F.2d 1361, 1369 (9th Cir.1986), *cert. denied,* 479 U.S. 1038, 107 S.Ct. 893, 93 L.Ed.2d 845 (1987); *State v. Smith,* 200 Conn. 465, 512 A.2d 189 (1986).

**12.** *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

The trial court denied the motion and stated counsel was "stuck with [the reason] given the first time."

The Court of Appeals reversed the trial court on the grounds that Lewis had not previously attempted to strike the juror, only Washington had, and because Lewis gave a race-neutral reason for striking the juror that was different from Washington's reason.

We find the Court of Appeals erred by reversing the trial court's decision not to allow Lewis to strike a juror who had previously been stricken in violation of *Batson*. *See State v. Ford*, 334 S.C. 59, 512 S.E.2d 500 (1999) (trial court's findings of purposeful discrimination rest largely on court's evaluation of demeanor and credibility, and reviewing court should give the findings great deference on appeal).

As we stated in *State v. Franklin*, 318 S.C. 47, 456 S.E.2d 357, *cert. denied*, 516 U.S. 856, 116 S.Ct. 160, 133 L.Ed.2d 103 (1995), to hold that a trial court may not seat a juror who was previously improperly excluded by defense counsel due to a *Batson* violation would reward a party for his own improper conduct.[13]  Lewis offered a reason for striking juror 304, *i.e.*, due to her demeanor,[14] that was different from the reason his co-defendant struck juror 304, *i.e.* she was a housewife.  However, the previous discriminatory explanation that the juror was stricken because she was a housewife tainted the selection process.  This is true regardless of the other explanations for the strike.  *See Payton v. Kearse*, 329 S.C. 51, 495 S.E.2d 205 (1998) (discriminatory explanation

---

**13.**  We disagree with the Court of Appeals' conclusion that Lewis should have been allowed to strike Juror 304 because co-defendant Washington had previously improperly struck the juror instead of Lewis.  We defer to the trial court's conclusion that the defendants were acting in concert when using their peremptory strikes.  *See State v. Ford, supra* (reviewing court should give trial court's findings regarding purposeful discrimination great deference on appeal).

**14.**  The demeanor of a juror is normally a legitimate reason for striking a juror.  *See State v. Shuler*, 344 S.C. 604, 545 S.E.2d 805, *cert. denied*, 534 U.S. 977, 122 S.Ct. 404, 151 L.Ed.2d 306 (2001) (demeanor of venire member when responding to questions about ability to impose death penalty provided valid racially neutral explanation for State's peremptory strike); *State v. Tucker*, 334 S.C. 1, 512 S.E.2d 99, *cert. denied*, 527 U.S. 1042, 119 S.Ct. 2407, 144 L.Ed.2d 805 (1999) (counsel may strike venire persons based on their demeanor and disposition).

vitiates entire selection process regardless of genuineness of other explanations for the strike). "To excuse such obvious prejudice because the challenged party can also articulate nondiscriminatory reasons for the peremptory strike would erode what little protection *Batson* provides against discrimination in jury selection." *Payton v. Kearse*, 329 S.C. at 60, 495 S.E.2d at 210. *See also Coleman v. Hogan*, 254 Va. 64, 486 S.E.2d 548 (1997) (allowing a constitutionally proper reason to override a constitutionally infirm reason if the acceptable reason is given later would erode the constitutional protections enunciated in *Batson* and its progeny).

To allow a striking party to challenge the reseated juror a second time would require the trial court to ignore its prior determination and the prior explanations and conduct each successive evaluation of a newly proffered rationale as if on a blank slate. *Coleman v. Hogan, supra.* Such a process improperly restricts the ability of the trial court to make the required evaluation. *Id.*

■ We conclude that once a juror has been unconstitutionally stricken, the jury selection process relative to that juror is tainted. If the trial court chooses to reseat the improperly stricken juror, the striking party may not use a peremptory strike to remove that juror from the panel a second time.

## CONCLUSION

We find the Court of Appeals properly affirmed the trial court's decision not to suppress an in-court identification. However, we find the Court of Appeals erred by finding the trial court had erred by not allowing Lewis to strike a juror who had previously been struck in violation of *Batson*. Therefore, the decision of the Court of Appeals is

**AFFIRMED IN PART, REVERSED IN PART.**

TOAL, C.J., WALLER, BURNETT, JJ., and Acting Justice A. VICTOR RAWL, concur.