662 S.E.2d 474

**The STATE, Respondent,**

v.

**William Frank CALDWELL, Appellant.**

No. 4392.

Court of Appeals of South Carolina.

Submitted March 1, 2008.
Decided May 15, 2008.
Rehearing Denied June 26, 2008.

Michael W. Barcroft, of Greenville, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attor-

ney General Salley W. Elliott, Senior Assistant Attorney General Harold M. Coombs, of Columbia; and Solicitor Robert M. Ariail, of Greenville, for Respondent.

HUFF, J.:

William Frank Caldwell appeals from his convictions for three counts of violating the eavesdropping or peeping tom statute. Caldwell asserts error in the trial courts (1) refusal to sever the trials, (2) denial of his motion to suppress the in-court identifications by a victim and a witness, (3) admission of alleged statements made by Caldwell, (4) admission of testimony regarding how Caldwell's actions made the victims feel, and (5) denial of his motion for directed verdict. We affirm.[1]

## FACTUAL/PROCEDURAL BACKGROUND

Caldwell was indicted in three separate indictments which alleged Caldwell did, on or about June 23, 2005, eavesdrop or peep on the premises of the Sugar Creek Homeowners Association, invading the privacy of three different young boys, hereinafter GT, DW, and QB. Caldwell was found guilty on all three charges, and was sentenced to three years, three years consecutive, and three years suspended to one year and five years probation.

Thirteen year-old GT testified that on the day in question he was participating in a swim meet, swimming for the Sugar Creek team. During the swim meet, he used the pool deck bathroom facilities twice. GT stated there were two sets of bathrooms around the pool, "one for the kids" located on the pool deck, and "another one for the adults" in the clubhouse. The first time he entered the bathroom by himself and saw a man at the far urinal. GT went to the other urinal where, because of the nature of his racing swim suit, he had to pull the front of the suit down to urinate. As he did so he saw the man at the far urinal "looking over at [his] private." When asked how this made him feel, GT replied "uncomfortable." GT went to the bathroom a second time and encountered the same man, who was coming out of one of the urinals as GT walked into the bathroom. As GT walked toward a urinal, the

---

1. We decide this case without oral argument pursuant to Rule 215, SCACR.

man turned around when he saw the young boy and went back to a urinal. When GT again pulled down his swim suit and began to urinate, the man looked "at [his] private again," and at that point, GT tried to cover himself up more. GT testified that when the man looked at him the second time, he "bent over and spit in the urinal and looked sideways" "to get a better look" at GT's privates. GT again responded it made him feel "uncomfortable" when the man looked at him the second time. GT also testified no one had ever made him feel the way this man did that day.

After exiting the bathroom from this second encounter, GT found his mother in the crowd watching the meet and told her he needed to speak to her. As his mother made her way through the chairs to follow him, GT saw his recent school teacher, Ms. Tate. His mother walked up as GT explained to Ms. Tate that there was a man in the bathroom looking at him. The two women told GT to go up on the balcony and point out the man to them. GT did so, and pointed out a man standing outside the boys' bathroom. GT made an in-court identification of Caldwell as the man who twice looked at his privates in the bathroom.

Thirteen year old DW also testified at Caldwell's trial. DW testified that in June of the previous year, he swam in a swim meet on the Sugar Creek team. The first time he went to the bathroom, he entered by himself and saw a man towards the back in the shower area. DW went to the first urinal and pulled down the front of his swimsuit to urinate. As he did so, the man, who had taken a position at a urinal, started to glance over at DW, looking at DW's privates but not his face. When asked how this made him feel, DW replied it made him uncomfortable. DW turned his back to the man, and after he finished urinating, he left the urinal to go swim in his events. DW went back to the bathroom a second time, this time with his friend JB. When he entered the bathroom this second time, he saw the same man that he encountered the first time, standing at the sinks. DW went to the first urinal and JB went to the second. When JB finished urinating, he left the urinal compartment and the same man came up to that urinal. Again the man glanced over, not at DW's face, but at his privates. DW again stated this made him feel uncomfortable. He also testified no one had ever made him feel the way this

man did on that day. DW made an in-court identification of Caldwell as the man in the bathroom who looked at his privates twice on the day in question.

JB, who was thirteen years old at the time of trial and also swam on the Sugar Creek team, likewise testified to events that occurred at the swim meet on June 23, 2005. JB stated that he and DW entered the boys' bathroom on the pool deck and saw an older man at the sink. JB used the far urinal and DW used the first one. JB stated he finished urinating first and went to wash his hands. As he did so, the man went to the second urinal. When JB finished washing his hands, he observed the man at the second urinal turn his head to the side and look down at DW's privates. The man was not looking at DW's face. JB and DW left the bathroom and went straight to swim in their event. JB made an in-court identification of Caldwell as the man looking at DW's privates that day.

Twelve year old QB also testified to an encounter with Caldwell while swimming on the Sugar Creek team in June of 2005. QB went alone to the bathroom for the boys located on the pool deck. There was a man in there at a urinal. QB went to a urinal and pulled down the front of his swimsuit to urinate. As he did so, the man looked down at QB's privates. QB testified this made him feel "really awkward." Like GT and DW, QB stated no one had ever made him feel the way this man made him feel that day. QB made an in-court identification of Caldwell as the man who looked at him in the bathroom. QB further testified, after he left the bathroom, he later saw the same man talking to DW's father outside the bathroom.

Ms. Tate, one of the presidents of the Sugar Creek swim team, testified that at the meet on June 23, 2005, she saw GT, whom she taught in fifth grade, and he appeared to be "very upset." She asked GT what was wrong, and he told her "there was a man in the bathroom that was watching him go to the bathroom." GT's mother came up to them as GT explained this to Ms. Tate. The two women sent GT up to the balcony as they walked over to the bathroom area. GT pointed out a man in that area to them. Ms. Tate then went to find someone who could help with the situation while GT's

mother stayed in the area to keep boys out of the bathroom. Ms. Tate found DW's father and led him back to the area in front of the bathrooms, where the man was still standing. DW's father approached the man and tried to engage him in conversation. Without objection, Ms. Tate made an in-court identification of Caldwell as the man pointed out by GT that day.

DW's father testified that during the swim meet on June 23, 2005, Ms. Tate approached him and told him what was occurring as she led him over to the bathroom area. After she pointed out Caldwell to him, DW's father walked up to the man and introduced himself, attempting to engage the man in conversation. The man shook his hand, but never gave his name and apparently did not want to talk. At some point, DW's father asked the man if he had a child on either of the swim teams. The man told him he had an eleven year-old boy on the Sugar Creek team by the name of Trey Dowden. When confronted with the fact that DW's father knew most of the boys in that age group on the team, the man claimed they were new to the team. DW's father then asked the man what events his son was swimming in, and when the man stated he did not know, he told the man he would get a heat sheet that listed the children and the events. When he stepped back to get the heat sheet, he turned around and the man had left. DW's father spotted the man and walked toward him, holding up the sheet and telling him they could then look up his son. The man exited the pool area and DW's father followed him. The man then ran away into a residential area and DW's father pursued him for twenty or twenty-five minutes until some police officers arrived and apprehended the man. Without objection, DW's father identified Caldwell as the man he had pursued that day. DW's father further testified there was no Trey Dowden in the eleven and twelve age group on either of the swim teams.

Deputy Chuck Porter arrived on the scene and spoke with Caldwell. After the officer advised him of his *Miranda*[2] rights, Caldwell indicated he understood his rights and was willing to speak to him without an attorney present. Officer

---

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Porter than asked Caldwell if he could tell him "what's going on." Caldwell stated he had been confronted by someone he believed to be a parent over at the pool and he had been "accused of doing something to one of the little boys in the restroom." Officer Porter asked, "Well, did you?" Caldwell replied that "[h]e was there to look at the boys, but hadn't touched anyone." When asked if Caldwell said anything else, the officer testified Caldwell "said he preferred to look at the younger boys."

## ISSUES

I. Did the trial court err in refusing to grant Caldwell's motion for separate trials on each indictment?

II. Did the trial court err in refusing to suppress the in-court identification by the minors DW and JB?

III. Did the trial court err in allowing testimony of the alleged statements made by the defendant to Officer Porter?

IV. Did the trial court err in allowing the victims to testify how they felt when Caldwell looked at them?

V. Did the trial court err in refusing to direct a verdict in favor of Caldwell?

## LAW/ANALYSIS

### I. Motion for Separate Trials

On appeal, Caldwell contends the trial court erred in refusing to grant his motion for separate trials on each of the indictments. He contends the joint trial on the indictments was extremely prejudicial such that the trial court committed error in failing to sever them. We disagree.

A motion for severance is addressed to the sound discretion of the trial court and the courts ruling will not be disturbed on appeal absent an abuse of that discretion. *State v. Harris*, 351 S.C. 643, 652, 572 S.E.2d 267, 272 (2002). Criminal charges can be tried together where they (1) arise out of a single chain of circumstances, (2) are proved by the same evidence, (3) are of the same general nature, and (4) no real right of the defendant has been prejudiced. *State v. Tucker*, 324 S.C. 155, 164, 478 S.E.2d 260, 265 (1996). Where

the offenses charged in separate indictments are of the same general nature involving connected transactions closely related in kind, place and character, the trial judge has the discretionary power to order the indictments tried together if the defendants substantive rights would not be prejudiced. *State v. Cutro*, 365 S.C. 366, 374, 618 S.E.2d 890, 894 (2005); *State v. Smith*, 322 S.C. 107, 109, 470 S.E.2d 364, 365 (1996).

■ Offenses are considered to be of the same general nature where they are interconnected. *State v. Simmons*, 352 S.C. 342, 350, 573 S.E.2d 856, 860 (Ct.App.2002). Conversely, offenses which are of the same nature, but which do not arise out of a single chain of circumstances and are not provable by the same evidence may not properly be tried together. *Id.*

Caldwell does not dispute that the indictments are of a similar nature and arise out of a single chain of circumstances. He contends, however, that the individual charges cannot be proven with the same evidence, as each charge required separate evidence from the others. He further asserts that a single trial of all three charges resulted in extreme prejudice inasmuch as he was unable to sequester the witnesses and there was an unfair collective impact of emotional testimony of the several victims. We disagree.

All three charges here arise out of a single chain of circumstances, occurring on the same afternoon, during the same event, and at the same place. While the alleged crimes involved pertained to three separate children necessitating some individual evidence as to each of the charges, much of the evidence produced at trial pertained to each of the separate charges. Thus, the separate offenses are proved by the same evidence. We find the fact that some additional evidence from the individual victims may be necessary to prove the individual crimes is not fatal to the joinder of the charges.

■ We likewise do not find compelling Caldwell's argument regarding the sequestering of witnesses. A party is not entitled to the sequestration of witnesses as a matter of right. *State v. Fulton*, 333 S.C. 359, 375, 509 S.E.2d 819, 827 (Ct.App. 1998). Whether or not witnesses are sequestered is a matter within the discretion of the trial court. *State v. Sullivan*, 277 S.C. 35, 46, 282 S.E.2d 838, 844 (1981), *superseded in part by State v. Gilchrist*, 342 S.C. 369, 536 S.E.2d 868 (2000). Fur-

ther, the mere opportunity for the State's witnesses to compare testimony is insufficient to compel sequestration. *Id.* Thus, it is not clear that, had Caldwell been tried separately on each charge, he would have been entitled to sequester the witnesses. In any event, we find no evidence of record that his inability to sequester the witnesses unduly prejudiced his case.

Finally, we find meritless Caldwell's assertion that the collective emotional testimony of the child victims unduly prejudiced him. Caldwell does not argue on appeal that the testimony of the individual victims would be inadmissible at the other trials if he were to be tried separately on each indictment. *See* Rule 404(b), SCRE; *State v. Lyle,* 125 S.C. 406, 118 S.E. 803 (1923) (evidence of other crimes may be admissible when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the proof of the other; or (5) the identity of the person charged with the present crime). Thus, Caldwell might still be faced with the children's "collective" testimony were he to be tried separately on each charge. At any rate, we do not believe the testimony of the child victims in this case can be accurately described as emotional. We simply find no prejudice to Caldwell in the trial court's denial of his motion to sever.

## II. In-court Identifications by DW and JB

■ Although Caldwell objected to the in-court identification by all three of the child victims and the child witness at trial, on appeal he only challenges the identifications by victim DW and witness JB. We find no error.

At the request of defense counsel, the court held a *Neil v. Biggers*[3] hearing to determine the admissibility of the identification of Caldwell by the child victims and witness. Deputy Ken Hinkle testified in the hearing that he worked for the sheriff's office and was assigned as the community patrol officer for Sugar Creek. On the day of the swim meet, he met with GT, JB, DW, and QB in his office at the clubhouse. He interviewed each boy separately, in the presence of their

---

3. *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

parents. The boys did not give detailed descriptions of the man in the bathroom, but indicated it was a white male and was "the person that [DW's father] chased." The following day, Deputy Hinkle met with three of the boys. At that time he obtained a written statement from GT, DW, and JB. Deputy Hinkle wrote their statements as the boys told him what had occurred. However, the deputy acknowledged that the last sentence of each of the boys' statements was not told to him by the boys, but was written in the statements by the deputy. The last sentence in each statement said, "I now know the man to be William Frank Caldwell." When asked why he included that in the statements, Deputy Hinkle responded that "[i]t was the same person ... they saw in the bathroom ... they pointed out to [DW's father], to the person that he chased, to the person that we took custody of," and he "simply condensed it into a name." Deputy Hinkle took a statement from DW's father, who identified the individual he chased. When talking to the boys, they referred to the person in question as the man DW's father chased. The deputy denied ever showing the boys a picture or a lineup of Caldwell or ever bringing Caldwell in front of the boys for them to make an identification. Deputy Hinkle did not know whether the three boys knew Caldwell's name before he wrote it in their statements.

The trial court, while acknowledging there was a "suggestive statement made at the end of the written statements as to the name identity of the individual," found the identification testimony was admissible. The court reflected the basis of the identification by the boys was tied together and, while noting it was subject to cross-examination and the exploration of credibility before the jury, the court determined the procedure was not unnecessarily suggestive and was reliable based upon all the evidence.

A criminal defendant may be deprived of due process of law by an identification procedure which is unnecessarily suggestive and conducive to irreparable mistaken identification. *State v. Traylor*, 360 S.C. 74, 81, 600 S.E.2d 523, 526 (2004). An in-court identification of an accused is inadmissible if a suggestive out-of-court identification procedure created a very substantial likelihood of irreparable misidentification. *Id.* Generally, a trial court must hold an in camera hearing

when the State offers a witness whose testimony identifies the defendant as the person who committed the crime, and the defendant challenges the in-court identification as being tainted by a previous, illegal identification or confrontation. *State v. Ramsey*, 345 S.C. 607, 613, 550 S.E.2d 294, 297 (2001).[4] The purpose of the in camera hearing is to determine whether the in-court identification was of independent origin or was the tainted product of the circumstances surrounding the prior, out-of-court identification. *State v. Carlson*, 363 S.C. 586, 594, 611 S.E.2d 283, 287 (Ct.App.2005).

We find no evidence the in-court identifications of Caldwell by DW and JB were in any way tainted by the deputy supplying Caldwell's name to them. Although we do not condone law enforcement including information in a statement that was not specifically provided by the witness, we simply find no indication that placing a name with the suspect in any way tainted the in-court identifications by the two boys such that their visual identification of the defendant in court was no longer of independent origin, or that supplying the name created a very substantial likelihood of irreparable misidentification.

### III. Admission of Statements

On appeal, Caldwell raises two grounds for error in the admission of his alleged statements to Officer Porter. He first contends the statement that he preferred to look at

---

4. Although the State opposed a *Neil v. Biggers* hearing at the trial level arguing it was unnecessary where the in-court identification forms the first identification the witness made, it does not so argue on appeal. Because we find no error in the admission of the in-court identifications, we express no opinion on whether such a hearing was required under the circumstances. *See State v. Lewis*, 363 S.C. 37, 43, 609 S.E.2d 515, 518 (2005) (holding *Neil v. Biggers* does not apply to a first-time in-court identification because the judge is present and can adequately address relevant problems; the jury is physically present to witness the identification, rather than merely hearing testimony about it; and cross-examination offers defendants an adequate safeguard or remedy against suggestive examinations); *but cf. State v. Simmons*, 308 S.C. 80, 82–83, 417 S.E.2d 92, 93 (1992), (holding in camera hearing was needed to determine whether the in-court identification was of independent origin or was the tainted product of the circumstances surrounding a bond hearing where a witness saw a suspect at a bond hearing prior to his in-court identification of the suspect and the witness may have gotten a "fix" on the suspect at the bond hearing).

younger boys was inadmissible character evidence. He further asserts no alleged statements made by him to the officer were admissible because the State failed to properly disclose the substance of the statements to him pursuant to Rule 5, SCRCrimP. We find no reversible error.

The court held a *Jackson v. Denno*[5] hearing on the admissibility of statements made by Caldwell to Officer Porter. During the hearing, the officer testified that when he asked Caldwell what was going on, Caldwell made the statement he had been confronted outside the restroom and accused of doing something to the little boys inside the bathroom. When asked if he had, Caldwell responded that "he was there looking at the boys, but he hadn't touched anyone." Officer Porter next asked Caldwell if he was gay, to which Caldwell stated that he was, but he preferred younger men. When questioned about the whereabouts of his report on the matter, Officer Porter stated he prepared it and turned it in, but it was apparently lost. He subsequently prepared a secondary report dated April 9, 2006 from memory after the original report could not be located. Caldwell testified during the hearing and denied making these statements to Officer Porter.

Following the hearing, the defense objected to the admission of the statements based on their relevance and the prejudicial effect, as well as the State's failure to comply with their discovery request. The trial court denied the motion to suppress based on defense's discovery violation argument. It further ruled the statement that Caldwell was gay was not relevant, and it would not allow any comment as to Caldwell's sexual orientation. It determined, however, that the other statements were relevant and admissible.

### A.   Improper Character Evidence

We first question whether Caldwell's assertion regarding improper character evidence is properly preserved for our review. Caldwell maintains on appeal the trial court erred in allowing testimony that he preferred to look at younger boys into evidence as such testimony is improper character evidence under Rule 404, SCRE, as well as the case of *State v. Nelson*, 331 S.C. 1, 501 S.E.2d 716 (1998). However, at trial

---

5. *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

defense counsel clearly objected to the evidence on the basis that any probative value was outweighed by the prejudicial effect. Counsel never mentioned either Rule 404 or the *Nelson* case. While he did quickly reference character when he argued that the State was attempting "to evoke strong emotion against somebody whose character may or may not be into evidence," this argument appears to have been made in conjunction with his assertion that the statement regarding his sexual orientation was inadmissible. The trial court ultimately agreed with the defense on the sexual orientation issue, and the alleged statement that Caldwell was gay was not admitted into evidence. Because the argument raised on appeal does not appear to have been specifically raised below, it may not be preserved on appeal. *See State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 694 (2003) (noting "[a] party need not use the exact name of a legal doctrine in order to preserve it, but it must be clear that the argument has been presented on that ground"); *State v. Haselden*, 353 S.C. 190, 196, 577 S.E.2d 445, 448 (2003) (holding party may not argue one ground at trial and another on appeal; where appellant did not object to testimony at trial on the grounds raised on appeal, that it was improper character evidence, but objected only on the basis of relevancy, issue was not preserved for review).

■■■ Assuming arguendo the argument as to character evidence is properly preserved, we nonetheless find no error. Generally, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Rule 404(a), SCRE. In *State v. Nelson*, 331 S.C. 1, 501 S.E.2d 716 (1998), the appellant was convicted at trial of four counts of first degree CSC with a minor and four counts of lewd act on a child. Nelson made post-arrest statements to police indicating he was uncomfortable around adult women and that he had fantasies about children. The trial judge overruled Nelson's objection to testimony concerning Nelson's fantasies or likes or dislikes of females. On appeal from this court's affirmance of Nelson's convictions, the South Carolina Supreme Court reversed, holding the trial court erred in allowing the jury to hear those statements, as Nelson's "general sexual attitudes were not relevant or material to the crime charged because

they were admitted to show character". *Id.* at 16, 501 S.E.2d at 724.

Subsequent to the *Nelson* decision, this court addressed the issue of whether testimony concerning a defendant's statement to police indicating he had a problem with his sexual desires constituted improper character evidence. *State v. Tufts,* 355 S.C. 493, 585 S.E.2d 523 (Ct.App.2003), *cert. denied* (June 24, 2004). In *Tufts,* the appellant was charged with and convicted of criminal sexual conduct in the third degree in regard to an encounter with a patient at Aiken Regional Medical Center. While being interviewed by the police, Tufts told a detective he had been arrested and charged in a sexual matter in Augusta, Georgia in 1995 while he worked at the University Hospital. When the detective told Tufts it sounded like he may have a problem, Tufts stated that he knew he had a problem with his sexual desires. *Id.* at 495, 585 S.E.2d at 524. Following an in camera hearing on the matter, the trial court determined the alleged statement concerning Tufts's prior charge in Georgia was inadmissible. However, it ruled that the portion of the conversation concerning Tufts's knowledge that he had a problem with his sexual desires could be construed as a confession and was therefore admissible. *Id.* at 496, 585 S.E.2d at 524.

On appeal, Tufts asserted the detective's testimony constituted improper character evidence, relying primarily on *Nelson.* While acknowledging the statement in question was similar to the type of evidence presented in *Nelson* which was disallowed by the court, we found the *Nelson* decision distinguishable and affirmed Tufts's conviction. First, we noted in *Nelson* that, aside from the statements made by Nelson that he was uncomfortable around adult women and had fantasies about children, the State sought to admit a number of toys, tapes of children's shows, storybooks, and photographs of young children. The State presented expert testimony that pedophiles often maintain a large stash of childlike items. Over Nelson's objection, the trial court ruled "the evidence was probative not of a 'character issue' but of a 'personality characteristic,' i.e., that the defendant was a pedophile." *Id.* at 497–98, 585 S.E.2d at 525. In *Tufts,* our court concluded the statements made by Tufts were not introduced to show his

bad character, but were admitted as a confession to the crime with which he was charged. We stated:

> In *Nelson*, the offered evidence and the defendant's statements were relevant only to prove that the defendant was a pedophile. The fact that the defendant was a pedophile spoke only to his propensity to commit the charged offense, and evidence thereof was thus inadmissible. In the present case, however, Tufts's statements were not admitted to show his character; instead, they were admitted as a confession to the specific crime charged.

*Id.* at 498, 585 S.E.2d at 526.

Similarly, Caldwell's statements that he "was there to look at the boys, but hadn't touched anyone" and that he "preferred to look at the younger boys" were not introduced to show his bad character, but were intended to convey to Officer Porter that he had committed the offenses with which he was subsequently charged, i.e. being a peeping tom. Accordingly, as in *Tufts*, the statements were properly admitted as a confession to the charged crimes.

■ At any rate, we find any error in the admission of this evidence to be harmless in light of the overwhelming evidence showing Caldwell entered and/or remained in the boys' bathroom for extended periods of time, furtively viewing the privates of these young boys. *See State v. Brown*, 344 S.C. 70, 74, 543 S.E.2d 552, 555 (S.C.2001) (the erroneous admission of character evidence is harmless beyond a reasonable doubt if its impact is minimal in the context of the entire record).

### B. Failure to Comply with Discovery

■ Caldwell further asserts the trial court erred in admitting the alleged statements made to Officer Porter because the State violated Rule 5(a)(3), SCRCrimP by failing to properly disclose the substance of the alleged statements in a timely manner. We find no error.

"Upon request by a defendant, the prosecution shall permit the defendant to inspect and copy or photograph: ... the substance of any oral statement which the prosecution intends to offer in evidence at the trial made by the defendant whether before or after arrest in response to interrogation by any person then known to the defendant to be a prosecution

agent." Rule 5(a)(1)(A), SCRCrimP. "The prosecution shall respond to the defendant's request for disclosure no later then thirty (30) days after the request is made, or within such other time as may be ordered by the court." Rule 5(a)(3), SCRCrimP. A Rule 5 violation is not reversible unless prejudice is shown. *State v. Landon,* 370 S.C. 103, 108, 634 S.E.2d 660, 663 (2006).

We find no prejudice to Caldwell such as would entitle him to suppression of the statements. The statements, as referred to in Officer Porter's supplemental report, were admittedly turned over to the defense in April 2006. Caldwell contends the State's failure to disclose the alleged statements until that time prejudiced him because, after that point, the opportunity afforded to him to plead to only a single indictment had passed. However, a defendant has no constitutional right to plea bargain. *State v. Chisolm,* 312 S.C. 235, 237, 439 S.E.2d 850, 852 (1994). Thus, Caldwell was not prejudiced by the delayed disclosure. *See Chisolm,* 312 S.C. at 237–38, 439 S.E.2d at 851–52 (holding, even though assistant solicitor acted inappropriately by communicating with a party known to be represented by counsel and by surreptitiously tape recording the conversation, assertion appellant was prejudiced as evidenced by the absence of plea negotiations was insufficient inasmuch as a defendant has no constitutional right to plea bargain).

IV. Admission of Testimony on How the Victims Felt

Caldwell next asserts the trial court erred in allowing the victims to testify to how it made them feel when he looked at them in the bathroom, and whether anyone had ever made them feel that way before. He argues this line of questioning was irrelevant and appealed to the passion and sympathy of the jury such that the prejudice to him outweighed any probative value. We disagree.

For evidence to be admissible, it must be relevant. Rule 402, SCRE. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. "Evidence is relevant if it tends to establish or

make more or less probable some matter in issue upon which it directly or indirectly bears, and it is not required that the inference sought should necessarily follow from the fact proved." *State v. Sweat*, 362 S.C. 117, 126–27, 606 S.E.2d 508, 513 (Ct.App.2004). "Evidence is admissible if 'logically relevant' to establish a material fact or element of the crime; it need not be 'necessary' to the State's case in order to be admitted." *Id.* at 127, 606 S.E.2d at 513. Relevant evidence may be excluded where its probative value is substantially outweighed by the danger of unfair prejudice. Rule 403, SCRE; *State v. Pagan*, 369 S.C. 201, 210, 631 S.E.2d 262, 266 (2006). Evidence is unfairly prejudicial if it has an undue tendency to suggest a decision on an improper basis, such as an emotional one. *State v. Cheeseboro*, 346 S.C. 526, 547, 552 S.E.2d 300, 311 (2001). A trial court's decision regarding the comparative probative value and prejudicial effect of evidence should be reversed only in exceptional circumstances. *State v. McLeod*, 362 S.C. 73, 81, 606 S.E.2d 215, 219 (Ct.App.2004). Determination of relevancy is largely within the discretion of the trial court and will not be reversed absent an abuse of that discretion. *Sweat*, 362 S.C. at 127, 606 S.E.2d at 513.

The "peeping tom" statutory section with which Caldwell was charged provides, in part, that a peeping tom includes one whose conduct is such that it "tends to invade the privacy of others." S.C.Code Ann. § 16–17–470(A) (2003).[6] While the determination of whether the conduct of Caldwell tended to invade the privacy of the three young victims is ultimately for the jury, we believe the specific testimony in question, although maybe not necessary to the State's case, is logically relevant to the establishment of that element of the crime. Further, the record shows the trial court limited the State to eliciting a concise statement from the victims on the privacy issue to keep any prejudice to a minimum, and the State did not stray beyond those parameters. Accordingly, we do not

---

6. Caldwell cites to language in the statute defining the phrase "[p]lace where a person would have a reasonable expectation of privacy" in support of his argument this testimony was not relevant. However, this phrase applies to the section of the statute prohibiting the crime of voyeurism and is not found in the section prohibiting eavesdropping and peeping. S.C.Code Ann. § 16–17–470(A), (B), and (D) (2003).

believe the probative value of the testimony is substantially outweighed by the danger of unfair prejudice.

### V. Denial of Motion for Directed Verdict

Finally, Caldwell raises three grounds on appeal as to why the trial court erred in denying his motion for directed verdict. He maintains the State failed to establish that (1) he was on the premises of another, (2) he spied upon or invaded the privacy of another, or (3) that the looks cast by him arose to the level required by the peeping tom statute.

On appeal from the denial of a motion for directed verdict, an appellate court must view the evidence in the light most favorable to the State. *State v. Weston,* 367 S.C. 279, 292, 625 S.E.2d 641, 648 (2006). The trial court, in a directed verdict motion, is concerned with the existence or nonexistence of evidence, not with its weight. *State v. Freiburger,* 366 S.C. 125, 136, 620 S.E.2d 737, 743 (2005). A defendant is entitled to a directed verdict when the State fails to produce evidence of the offense charged. *State v. McCombs,* 368 S.C. 489, 493, 629 S.E.2d 361, 362–63 (2006). If there is any direct evidence or substantial circumstantial evidence reasonably tending to prove the guilt of the accused, we must find the case was properly submitted to the jury. *Id.* at 493, 629 S.E.2d at 363.

Caldwell was charged with violating our peeping tom statute. Specifically, the indictments charged that Caldwell did, "unlawfully eavesdrop or peep on or about the premises of the Sugar Creek Homeowners Association, or did go upon the premises of the Sugar Creek Homeowners Association, for the purpose of becoming an eavesdropper or a Peeping Tom invading the privacy of [the victims]." The peeping tom statute provides in pertinent part as follows:

> It is unlawful for a person to be an eavesdropper or a peeping tom on or about the premises of another or to go upon the premises of another for the purpose of becoming an eavesdropper or a peeping tom. The term "peeping tom", as used in this section, is defined as a person who peeps through windows, doors, or other like places, on or about the premises of another, for the purpose of spying upon or invading the privacy of the persons spied upon and

any other conduct of a similar nature, that tends to invade the privacy of others.

S.C.Code Ann. Section 16–17–470(A) (2003).

## A. Premises of Another

■■■ Caldwell first contends the State failed to meet its burden of showing he was "on or about the premises of another." He asserts the evidence shows he was clearly on public property and that inherent in the statute is the requirement that the accused's presence be unlawful on the premises. We disagree.

The record shows, although the swim meet was open to the public, the pool area is on private property. Further, the State presented evidence that it was uncommon for people who are not family members or friends of the child participants to attend these swim meets.

Caldwell relies primarily on this court's opinion in *Herald Publ'g Co. v. Barnwell*, 291 S.C. 4, 351 S.E.2d 878 (Ct.App. 1986). There, our court held the peeping tom/eavesdropping statute was inapplicable to the conduct of newspaper reporters who sought to overhear proceedings of city council while it was in executive session. We find *Herald Publ'g Co.* to be distinguishable. That was a civil case wherein newspaper publishers brought an action against members of city council alleging that council violated the open-meeting requirement of the South Carolina Freedom of Information Act. Council denied the alleged violations and counterclaimed, alleging that newspapers had violated the Act by eavesdropping on the executive session. This court affirmed the trial court's denial of injunctive relief to city council, noting "there is no evidence that the reporters did anything to enable them to overhear what was going on in the executive session other than to wait in the place provided as a waiting room for reporters and other members of the public." Because the reporters were on public property, in a place provided to them and other members of the public at the time of the alleged actions, they were not "on or about the premises of another." *Id.* at 12–13, 351 S.E.2d at 883. Here, Caldwell clearly was not on public property.

We do not read into the statute, as does Caldwell, that an accused must be unlawfully upon the premises prior to the objectionable conduct for the statute to apply. There is no such language in the statute. Certainly there are those situations where one might be lawfully upon the premises of another and still invade the privacy of another by peeping in violation of the statute. Accordingly, the State has presented evidence Caldwell was on private property and that he was peeping "on or about the premises of another."

### B. Spying upon or Invading the Privacy of Another

Next Caldwell maintains the State failed to present evidence that he either spied upon or invaded the privacy of another. He argues there is no evidence he spied, because the statute requires one to look "through windows, doors, or other like places, on or about the premises of another" in order to be spying. He further asserts there is no evidence he invaded the privacy of another because there could be no expectation of privacy in the unpartitioned urinals in the Sugar Creek bathroom. We disagree.

First, the statute does not limit the proscribed behavior of a peeping tom to one who looks "through windows, doors, or other like places," but also prohibits "any other conduct of a similar nature, that tends to invade the privacy of others." We conclude, while there is no evidence Caldwell looked **"through"** any windows, doors, or the such, there is evidence of **"other conduct of a similar nature,"** tending to invade the privacy of others.[7] Accordingly, the State did present evidence Caldwell was on the premises of another for the purpose of spying upon another.

Further, while Caldwell correctly points out that there was no physical barrier, such as a partition, to afford the young boys **complete** privacy, we find, under the facts of this case, the victims did in fact have an expectation of privacy such that there is evidence Caldwell was on the premises of another for the purpose of invading that privacy. The evidence shows the children were participating in a swim meet on private proper-

---

7. It should be noted, while Caldwell challenged the constitutionality of the statute at trial, in particular the phrase "other conduct of a similar nature, that tends to invade the privacy of others," as being overly broad, he does not raise that issue on appeal.

ty. The young, male victims used the boys' bathroom on the pool deck that was provided "for the kids," while another bathroom for the adults was located in the clubhouse. While in the boys' bathroom, the three victims encountered Caldwell at least five separate times. The record shows Caldwell, on more than one occasion, was either in another area of the bathroom or appeared to be exiting the bathroom when he purposely came back to one of the urinals just as a victim went to use the other urinal. There is evidence that on each occasion Caldwell specifically looked directly at the boys' privates and, on at least one occasion, bent over and spit in the urinal and looked sideways in order to get a better look at the privates of one of the children. We find there is more than sufficient evidence Caldwell invaded the privacy of his three young victims, inasmuch as children should reasonably expect a certain degree of privacy when urinating in a bathroom that, when respected, would protect them from peering adults.

## C. Looks Cast by Appellant

Finally, Caldwell argues he was entitled to a directed verdict because the alleged looks cast by him did not arise to the level required by South Carolina Code Ann. Section 16–17–470(D)(3) (2003), which provides "As used in this section ... 'View' means the intentional looking upon of another person for more than a brief period of time, in other than a casual or cursory manner...." As previously noted, subsection (D) of this statute clearly refers to the terms used in subsection (B) of the statute which prohibits the crime of voyeurism. S.C.Code Ann. § 16–17–470(B) and (D) (2003). Subsection (A) of the statute prohibits one from "peep[ing] through windows, doors, or other like places ... and any other conduct of a similar nature, that tends to invade the privacy of others." S.C.Code. Ann. § 16–17–470(A) (2003). "Peep" has been defined alternatively as "to look cautiously or slyly; a brief look: glance; a furtive look." Webster's Ninth New Collegiate Dictionary 867 (9th ed.1990). There is clearly evidence that Caldwell peeped at each of the young victims' privates. Finally, even if we were to assume arguendo subsection (D) of the statute applied, we find there is evidence Caldwell did intentionally look at the privates of the three

young victims for more than just a brief period of time in other than a casual or cursory manner.

## CONCLUSION

Based on the foregoing reasons, we find no reversible error in the trial court's refusal to sever the trials, denial of Caldwell's motion to suppress the two boys' in-court identifications, admission of alleged statements made by Caldwell, admission of testimony regarding how Caldwell's actions made the victims feel, and denial of Caldwell's motion for directed verdict. Accordingly, Caldwell's convictions are

**AFFIRMED.**

WILLIAMS, J., concurs.

KITTREDGE, J., concurs in result.

KITTREDGE, J.:

I concur in result but write separately as I believe it was error to admit the victims' testimony concerning how they felt when Caldwell stared at their genitals. As the defense points out, the presence or absence of a victim's "feelings" is irrelevant under the "peeping tom statute" because a victim's emotional response has no bearing on any element of the crime. Indeed, in many such prosecutions, the victim is unaware of the peeping tom's presence and the invasion of privacy. I concur in result as this error was harmless due to the overwhelming evidence of guilt. *State v. Garner,* 304 S.C. 220, 222, 403 S.E.2d 631, 632 (1991) (holding improperly admitted evidence was harmless error given the overwhelming evidence of guilt).